**MILLER SHAH LLP**
JAMES C. SHAH
NATALIE FINKELMAN
2 Hudson Place #303
Hoboken, NJ 07030
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
jcshah@millershah.com
nfinkelman@millershah.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CATHY JO THOMSON and DONALD FRED THOMSON, Individually and Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>VOLVO CAR NORTH AMERICA, LLC, and VOLVO CAR USA, LLC,<br><br>Defendants. | No.<br><br>**CLASS ACTION COMPLAINT** |

Plaintiffs, Cathy Jo Thomson and Donald Fred Thomson ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this nationwide class action against Defendants, Volvo Car North America, LLC ("VCNA") and Volvo Car USA, LLC, ("VCUSA") ("collectively "Volvo" or "Defendants"). Plaintiffs allege the following based on information and belief, the investigation of counsel, and personal knowledge.

## I. INTRODUCTION

1. This action concerns two defects that present dangerous safety hazards in model year 2022-2024 XC40 and C40 vehicles designed, manufactured, and sold by Volvo ("Vehicle(s)" or "Class Vehicle(s)").

2. Volvo's Rear Auto Brake ("RAB") is a feature designed to detect objects in the surrounding area using camera and radar technology. Volvo's RAB is ostensibly designed to automatically brake when the car is in reverse or rolls backwards and senses other objects within near proximity as a safety feature.[1] However, this supposed safety feature is defective and regularly causes drivers to experience spontaneous engagement of the automatic braking system, frequently resulting in violent whiplash-like motion, which has caused and will continue to cause injury to drivers ("Brake-Related Defect(s)").

3. The Dashboard Drive Display ("DD") is another feature in Volvo models and serves as a dashboard display for critical assistive driving features such as the speedometer, odometer, lane assists, blinkers, and navigation. Defects with this display cause a blackout of all or parts of the digital screens that significantly impairs driving abilities ("DD-Related Defect(s)"). Volvo is well aware of the

[1] https://www.volvocars.com/lb/support/car/xc60/article/b88c5feec7224834c0a8015100c38220/?msockid=2c6d9e8c11c76dd435cc88df10e96cfb. (last viewed November 042025)

Defect and has attributed the DD-Related Defect to a Google software issue it cannot directly address.

4. These two dangerous defects (the "Defect(s)") in Volvo's Vehicles pose serious risks of injury to drivers and can transform everyday driving, such as in a home's driveway, crowded parking lot, or highway, into zones of high risk.

5. Volvo was made aware of these defects as early as 2021 through its review of data within Volvo's own control and to which it had ready access, including: prerelease testing artifacts such as test cases, test plans and binary files; warranty data; dealer communications and reports; and complaints from other consumers. Yet, instead of addressing, repairing, or providing an adequate warning of the safety risks to consumers, Volvo concealed the Defects, consistently denying responsibility despite clear recognition and acknowledgment of these Defects by Volvo's authorized dealers.

6. Notwithstanding its knowledge of the Defects, Volvo has neglected to take any action or otherwise remedy the issues related to either the RAB or the DD Defects.

7. Volvo failed to disclose these Defects because it knew the information would affect its reputation, as well as influence Plaintiffs and Class (defined below) members against purchasing, owning, or driving its Vehicles.

8. Through this action, Plaintiffs, on behalf of the Class, allege that Volvo's design, manufacturing, use of materials and workmanship, assembly, promotion, marketing, selling, and otherwise placing into the stream of commerce the Vehicles throughout the United States with inherent safety defects, were unlawful, unfair, and fraudulent business practices, and breaches of Volvo's warranties.

9. This class action seeks damages, restitution, equitable relief and any other available remedies for consumers who purchased or leased a Defective Vehicle.

## II. PARTIES

10. Plaintiff Donald Fred Thomson ("Mr. Thomson") is the lessee, and Plaintiff Cathy Jo Thomson, ("Mrs. Thomson") the co-lessee, of a 2024 Volvo C40 Recharge Pure Electric, VIN YV4ER3GL5R2106214 and of a 2024 Volvo C40 Recharge Pure Electric, VIN YV4ER3GL9R2101744.

11. Mr. Thomson and Mrs. Thomson, a married couple, reside in Leawood, Kansas.

12. Mr. Thomson primarily drives the aforementioned 2024 Volvo C40 Recharge Pure Electric, VIN YV4ER3GL5R2106214, and Mrs. Thomson primarily drives the aforementioned 2024 Volvo C40 Recharge Pure Electric, VIN YV4ER3GL9R2101744.

13. Mr. Thomson and Mrs. Thomson bring this action individually and as representatives of a Class of similarly situated consumers.

14. VCNA is a Delaware limited liability company with its principal place of business in Mahwah, New Jersey. VCNA serves as Volvo AB's regional operational hub for marketing, brand communications, and warranty program administration in the United States and is the parent of VCUSA. VCNA develops and executes Volvo's regional advertising campaigns and brand communications in the United States, shaping consumer perceptions of Volvo vehicle safety and reliability.

15. VCUSA is a Delaware limited liability company with its principal place of business in Mahwah, New Jersey. VCUSA is a wholly owned subsidiary of Volvo AB and serves as the exclusive importer and distributor of Volvo vehicles in the United States. Among other things, VCUSA is responsible for U.S. sales, marketing, warranty administration, and dealer communications. VCUSA imports, markets, and sells Volvo passenger vehicles in the United States and communicates with U.S. dealers and customers. Further, as the U.S. distributor and warrantor, VCUSA issued the New Vehicle Limited Warranty and controlled the administration of warranty claims in the United States.

16. Throughout this Complaint, "Volvo" is used to refer collectively to VCNA and VCUSA.

17. Non-Party Volvo Cars AB ("Volvo AB") is a Swedish public limited company headquartered in Gothenburg, Sweden. Volvo AB is the ultimate parent of numerous operating subsidiaries worldwide, including VCUSA.

18. Volvo, including its owners, employees, parent companies, subsidiaries, affiliates, and agents, developed, designed, manufactured, assembled, tested, inspected, marketed, promoted, advertised, warranted, distributed, and sold vehicles branded "Volvo." Volvo conducts substantial business within New Jersey and throughout the United States through the marketing, distribution, and sale of Volvo-branded vehicles.

## III. JURISDICTION AND VENUE

19. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

20. This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because at least one class member is of diverse citizenship from Defendants; there are more than 100 class members nationwide; and the aggregate amount in controversy exceeds $5,000,000.

21. This Court has personal jurisdiction over the parties because Defendants are headquartered in this state, conduct substantial business in this state,

have systematic and continuous contacts with this state, and have agents and representatives that can be found in this state.

22. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Defendants are residents of this judicial district, do business throughout this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims took place within this District. This Court accordingly has jurisdiction over this action and venue is proper in this District.

## IV. FACTUAL ALLEGATIONS

### A. Volvo's Brake-Related Defect Causes Sudden Unexpected Hard Brakes When In Reverse

21. Volvo's RAB is designed to function as a helpful tool for Volvo car drivers as they are reversing their vehicles. The RAB is intended to brake the car while the driver is reversing if its camera feature observes a possible hazard.

22. The following excerpt captures the purpose of the RAB function when reversing as displayed on Volvo's website:[2]

**Warning and auto-brake when reversing ***

There are systems in the car that can assist the driver to detect obstacles when reversing and even brake automatically if the driver does not manage to act in time.

Updated 10/17/2024

[2] https://www.volvocars.com/lb/support/car/xc60/article/b88c5feec7224834c0a8015100c38220/?msockid=2c6d9e8c11c76dd435cc88df10e96cfb (last viewed November 04, 2025).

If the accelerator pedal is depressed forcefully then the car also reverses after braking automatically.

> **Warning**
> - The functions are supplementary driver supports intended to facilitate driving and make it safer – but they cannot handle all situations in all traffic, weather and road conditions.
> - The driver is advised to read all sections in the owner's manual that relate to these functions to learn about factors such as limitations and what the driver should be aware of before using the functions.
> - Driver support functions are not a substitute for the driver's attention and judgement. The driver is always responsible for ensuring the car is driven in a safe manner, at the appropriate speed, with an appropriate distance to other vehicles, and in accordance with current traffic rules and regulations.

> **Note**
> The functions use the car's camera and radar units, which have certain general limitations.

### Obstacles immediately behind

Rear Auto Brake is intended to help the driver detect stationary obstacles that may be directly behind the car when it is being reversed.

This function is primarily designed to detect stationary obstacles that are higher than the rear bumper – and not moving vehicles, for example.

**BLIS**

The BLIS function is intended to help the driver detect vehicles diagonally behind and to the side of the car so as to provide assistance in...

**Activating and deactivating warning and auto-brake when reversing**

The driver can choose to deactivate auto-brake with Rear Auto Brake (RAB) and Cross Traffic Alert (CTA). The warning signal can be deacti...

24. As referenced above, although it is possible to disable the RAB feature, it must be disabled every single time a driver turns on the vehicle. Requiring multiple daily deactivations of the RAB feature at every use is unsafe and impractical and may lead to undesirable and even harmful situations for drivers and passengers of Volvo cars when Brake-Related Defects occur. As one driver noted: “I also really hate this feature. I actually find it dangerous because it is very [ ] and it disrupts the flow of driving (you have to change gear and move forward to release, which other drivers are not expecting). It’s far too sensitive. But I’m afraid to turn it off in case

I do hit something by accident."[3] Volvo is required to fix the Defect so that drivers can use the features of the Vehicles safely and as intended.

25. Official complaints were filed regarding defective RABs as early as 2021. Volvo has not taken any action to support Volvo drivers who experience this unsafe Brake-Related Defect on a daily basis.

26. The incidents experienced by Plaintiffs are not isolated incidents. Rather, they are part of a documented pattern of widespread consumer complaints spanning various model years and reported in forums, to Volvo and in government channels. These reports, which occurred before and after Plaintiffs' experiences, demonstrate that Volvo has been on notice of the issues affecting the Vehicles.

27. Volvo's failure to acknowledge responsibility did not stop consumers from extensively reporting the Defects in various online forums. The following are a sample of the numerous postings on the NHTSA website and other online forums regarding Volvo models affected by the Brake-Related Defect.[4]

28. On April 2, 2024, a driver of a 2024 Volvo XC40 submitted a complaint to the NHTSA regarding an incident that occurred two days prior. The driver wrote:

> There have been several times when slowly backing up when monitoring the mirrors and backup camera that the car had a very violent stop. I wasn't going fast at all and was within two feet of objects that I'm very familiar with. My old car handled backing up fine and didn't stop so violently. The warning on

[3] https://www.reddit.com/r/VolvoRecharge/comments/1bu35dn/automatic_braking/ (last viewed November 04, 2025).

[4] The Brake-Related Defect is present in the following models: 2022-2024 XC40 and C40.

> the old car got quicker as I got closer. This Volvo does have an increasingly rapid beep too but as you monitor the space it jerks so hard before it's really close enough to hit. This week I was backing up in a parking lot with NOTHING around me. I was still going slowly but the backup camera picked up an asphalt strip in between two cement pads and jerked so hard I have had whiplash like symptoms right after and ever since. The car stopped so hard my neck snapped back and I hit my head on the headrest. This incident was the most violent but there have been others that are too harsh for the slow moving conditions and insignificance of the objects.[5]

29. On July 7, 2023, on an online forum for Volvo C40 Recharge vehicles, one user described his/her experience as follows:

> My automatic braking system activates EVERY TIME I try to back out of my garage. Forget the fact that the sensors are going ballistic, but that sudden slam and jolt is not only annoying, but there's always a moment of panic before my brain figures out that I did NOT actually back into something.
> Anyone else having/had this issue? Is there a way to correct it? I'm backing out of an open garage with zero obstacles, so I'm perplexed as to why my car thinks I'm about to have a collision with something.[6]

30. Other class members are experiencing the same problems and there are a myriad forums where similar complaints are made, such as the Volvo Recharge Forum on Reddit,[7] for example:

- April, 2024: I honestly hate this feature. It's only ever activated when it shouldn't. It's seems most sensitive when I'm parking with other people in the car or in front of a group of people lol.

- April, 2024: Mine did this the other day when I was turning around in a neighbor’s driveway, and it was very jarring! I thought I had hit

[5]https://www.nhtsa.gov/?nhtsaId=11581246 (last viewed November 04, 2025).
[6]https://www.xc40forum.com/threads/automatic-braking-when-backing-out-of-garage.6698/ (last viewed November 04, 2025).
[7] https://www.reddit.com/r/VolvoRecharge/comments/1bu35dn/automatic_braking/ (last viewed November 04, 2025).

something. Anyway, there's a button to disable it on the rearview camera screen.

- May 2024: yeah, I have a 2023 C40 recharge and it's an absolute joke. I can't back into my carport. I can't back out into a street. like I'll be backing into the near lane and very clearly based on my trajectory and wheels, which are being displayed on the screen, I am not going to go into the opposite lane of traffic and yet I'll get a violent warning and then auto brake every time there's a car in the opposite lane and it's [ ] dangerous because I'm stopped while I was trying to back up into the street. And besides that it's a [ ] heart attack for no reason when there's 10 feet of room with a clear miss trajectory. It's so ridiculously untuned and [ ]. It pisses me off and I cannot believe they haven't updated it yet. I understand that I can disable it every time I put the car in reverse, but in any practical scenario, that's simply not safe and dumb because it takes a couple seconds to do so. For example, stopping in the middle of the street to back into my carport, but hold on, I've got a disable this stupid [ ]feature.

  does anyone know the email we can send feature requests and feedback to? this is only one of the incredibly dumb features/bugs with this car. I feel like a [ ] beta tester.

  I've become so much worse of a driver because of the oversensitive sensors and auto breaking where I'm [ ] stressed to back up into anything even though I've never hit anything whatsoever. I can't wait to get rid of this.

31. Other forums,[8] reveal numerous people with similar complaints, for example:

- July 11, 2023: Glad to have found this post. My story - got new C40 last week and parked in the garage. Over the weekend finally ready to drive my new car. Garage door is open, checked my left and right

[8]https://www.xc40forum.com/threads/automatic-braking-when-backing-out-of-garage.6698/ (last viewed, November 04, 2025)

> mirrors to ensure it will clear the edges of the garage, put the reverse gear, backup camera comes up, I release the break and car starts to backup and then a BAM ! The car jolted to a complete halt. It scared the living daylights out of me and I thought I hit my brand new car against the wall or center garage pillar. Insurance is going to total the car and an immediate remorse as I have been driving long enough with 0 accident on record. And then I'm seeing emergency brake message on the dash. Got down and the back is all clear ! Took me few minutes to recover from the situation. Thanked the gods for this NOT being an accident LOL.
>
> Car is for wife so gave her a heads up and thanks to members here to pointing out how to cancel the emergency brakes on reverse. My first Volvo so I'm little perplexed at its over sensitivity.

32. Volvo promotes the Rear Auto Brake as a safety feature to "assist the driver to detect obstacles when reversing" or to "brake automatically if the driver does not manage to act in time."[9] But this feature in practice is dangerous and disruptive to the Vehicle occupants.

**B. Dashboard Display Defect**

33. The Volvo dashboard display refers to the digital screens that display the vehicle's features ranging from a speedometer to modern entertainment systems. The DD controls both the Instrument Panel ("IP"), a feature that displays information regarding the vehicle's gauges, warning symbols, and assistive driving functions that are critical to proper operation of the vehicle, as well as the

---

[9] https://www.volvocars.com/lb/support/car/xc60/24w46/article/3ecaabd4c7ea7793c0a81f6f0b7a9421/bbdcb57ac7ed319cc0a81f6f0f55020e/b88c5feec7224834c0a8015100c38220/ (last viewed November 04, 2025).

infotainment system ("IS") that displays higher level functions such as navigation and media. Both the IP and IS activate upon opening the door and starting the Vehicle but will power down if not used and if the Vehicle is not started.

34. The DD-Related Defect causes the entire IP and/or IS to spontaneously black out, often while the Vehicle is in motion, posing serious safety risks for drivers.

***a. The Information Panel***

35. Volvo IPs are split into three sections. Each section contains important information regarding vehicle operation, including speed, temperature, power, battery, and potential warning symbols. Access to this information is critical for operating the Vehicles safely. The table below highlights the features in the IP.

Location in the instrument panel:

| Left side | In the center | Right side |
|---|---|---|
| Indicator and warning symbols | Indicator and warning symbols | Indicator and warning symbols |
| Speedometer | Temperature | Power meter |
| Cruise control/speed limiter information | Messages (also graphics in some cases) | Selected direction of travel |
| Trip odometer | Door and seat belt status | Battery gauge |
| – | Driver support system | – |
| – | App menu (activated using steering wheel keypad) | – |

36. The Volvo Vehicles have two different display modes, "Calm Mode" and "Navigation Mode," that can be changed by pressing a button located on the right-side steering wheel keypad. Calm Mode blacks out the center part of the IP containing features such as the indicator and warning symbols, door and seatbelt

status, driver support system, messages, temperature, and an app menu to reduce visual clutter.[10] However, even when Vehicles are in Calm Mode, the speedometer and power meter are clearly visible.




*Image representation of Calm Mode that temporarily hides the center display.*

37. Navigation Mode contains a navigation display in which a map is displayed over the entire IP.[11] This feature ensures that drivers can safely navigate while operating their vehicles.

[10] https://www.volvocars.com/en-ca/support/car/c40-recharge/23w46/article/8d5ce21f8c14b3a6c0a8cc7221c68fd0_bc49add2c7e5837ec0a81f6f381398ff_4b5b099cf34c358fc0a801510285ca7f/ (last viewed November 04, 2025).
[11] https://www.volvocars.com/en-ca/support/car/c40-recharge/23w46/article/8d5ce21f8c14b3a6c0a8cc7221c68fd0_bc49add2c7e5837ec0a81f6f381398ff_13801d0ae6e4fc4fc0a8015170652c29/ (last viewed November 04, 2025).




*Image representation of Navigation Mode where center display shows a GPS map.*

38. Volvo has issued warnings in its user manuals cautioning users to ***avoid driving*** the Vehicle when the IP cannot be read or if parts of it turn off.[12]

39. Despite these warnings, the user manual provides no explanation as to how to avoid DD-Related Defects. It merely warns drivers not to operate the vehicle and to "[c]onsult a workshop immediately."

**Warning**

If the instrument panel turns off, does not activate when the ignition is switched on, or part/all of the panel cannot be read, do not drive the vehicle. Consult a workshop immediately. Volvo recommends an authorized Volvo workshop.

**Warning**

If the instrument panel is not functioning properly, information about brakes, airbags or other safety-related systems may not be displayed. The driver will then not be able to check the status of the vehicle systems or receive relevant warnings and information.

[12] https://www.volvocars.com/en-ca/support/car/c40-recharge/23w46/article/8d5ce21f8c14b3a6c0a8cc7221c68fd0_bc49add2c7e5837ec0a81f6f381398ff_4b5b099cf34c358fc0a801510285ca7f/ (last viewed November 04, 2025).

### *b. The Infotainment System*

40. In 2022, Volvo partnered with Google to introduce an interactive touch-screen infotainment system ("IS") that interacts with the IP to deliver a so-called "seamless" digital experience.[13] The software stems from the use of the Android Automotive Operating System that replaces the older Volvo Sensus systems.[14]

41. This technology, which is included in the Vehicles, is supposed to allow users to connect their Google account to their Vehicle's technology and access information from apps such as Google Maps.

42. The IS serves to provide an interface for navigation, media, and communication services, whereas the IP displays essential driving features such as navigation, speedometer, and gear shift settings. The IS system is significantly integrated with the IP to allow for theoretically seamless accessibility to any user's driving needs.

43. Various users have reported issues with the IP and/or IS shutting off during operation of the Vehicles, hiding critical operation information and causing an extremely dangerous condition during which, according to Volvo, the Vehicle should not be driven.

---

[13] https://www.volvocarswaterloo.com/what-is-volvo-with-google-built-in-infotainment/ (last viewed November 04, 2025).
[14] https://www.volvocarsmidlothian.com/volvo-infotainment-system-info.htm#:~:text=How%20to%20Manage%20the%20Volvo,deeper%20personalization%20for%20this%20screen (last viewed November 04, 2025).

44. The following are a sample of the numerous postings on the NHTSA website regarding Volvos affected by the DS-Related Defects:

> *NHTSA Complaint on January 17, 2025, ID NUMBER: 11636593*
> THE CONTACT OWNS A 2023 VOLVO C40. ON 1/17/2025, THE CONTACT REPORTED FREQUENT ERRORS WITH THE INFOTAINMENT SCREEN. WHEN BACKING UP, THE SCREEN DISPLAYS A WARNING SIGN SAYING "BACKUP CAMERA NOT AVAILABLE." USER ALSO REPORTED THAT THE VEHICLE INDICATORS WERE NOT FUNCTIONING PROPERLY UNTIL THE SOFTWARE WAS RESET.

> *NHTSA Complaint on April 4, 2025, ID NUMBER: 11666908*
> THE CONTACT OWNS A 2024 VOLVO XC40. ON 4/4/25, USER REPORTED FREQUENT FREEZING OF THEIR INFOTAINMENT SYSTEM. THIS ISSUE RESULTS IN THE VEHICLE DENYING ACCESS TO CRITICAL CONTROLS INCLUDING ONE PEDAL EV DRIVING, AC/HEAT CONTROLS, AND VARIOUS OTHERS. THE USER REPORTS A WARNING MESSAGE APPEARING THAT STATES, "CAMERA IS UNAVAILABLE" FOLLOWED BY THE SCREEN GOING DARK. A DEALER HAS ATTEMPTED TO RELOAD AND UPDATE THE SOFTWARE WITHOUT ANY REMEDY.

45. Similarly, on May 5, 2024, one user stated in a Volvo Forum:

> We have a 2023 XC40 Recharge and today driving home the center screen froze, then went black. I turned the car off and it did not return. It now stays completely blank and there is no radio, no access to any of the controls.[15]

46. On February 14, 2025, another user with a 2023 model of the XC40 Recharge stated:

> Had my 2023 model for 18 months. We are experiencing a problem with the Infotainment System randomly rebooting while driving the car. It's

[15] https://volvoforums.com/forum/volvo-recharge-models-60/center-screen-wont-come-115655/ (last viewed November 04, 2025).

particularly annoying when using navigation. It takes about 90 seconds to recover the user interface. If you happen to be in tunnel the navigation does not recover until the car can sync to a GPS satellite. It's currently in for a service for this issue for the 3rd time and I'm not confident they can fix it. It's been factory reset many times. I've told them I need the infotainment "brain" replaced this time. Previous services they said they could not reproduce the problem. I had to provide video evidence of the problem. Clearly that's difficult if you're the only one in the car, but I did collect 18 videos of the issue occurring.[16]

47. On May 4, 2024, another user stated:

Bought a 2023 C40 about 18 months ago. Needed a new car somewhat urgently due to my old one dying unexpectedly, wanted an EV, have hated Musk since from when he was a Democrat let alone now that he's gone the other direction, and a C40 was on the lot and ready to go. Was pricier than we wanted, but figured we'd get our first true "adult" car in our 40s and comfortable.

I like just about everything about this car. Haven't encountered any of the issues/problems others have seemingly had. With one glaring exception… The infotainment system is garbage. It is slow. It is unresponsive. When I turn on the vehicle and back out of our garage onto the street, 8 times out of 10 the backup camera either doesn't load in time to be useful, is unstable and jumps between backup and overhead views, or simply doesn't turn on at all. This is a significant safety issue.

The infotainment system is so slow to load, I find myself sitting there waiting for it to load so that I can then hit several buttons and go through several screens to lower the rear seat head rests so I can at least get a little better visibility out the back—especially important if the backup camera goofs (which it usually does).

After turning the car on, Google maps often doesn't load or takes minutes to find itself and allow me to put in an address. Spotify takes minutes to load at times. Press the button to bring up the air conditioner/heater screen and it hangs for a few seconds. The UI is pretty bad and unintuitive, though

[16] https://www.xc40forum.com/threads/infotainment-system-random-restarts.8602/?nested_view=1&post_id=96392#post-96392 (last viewed November 04, 2025)

> after 18 months I figured out where everything is and how to navigate the screens.
>
> The whole infotainment system locked up and froze and least three times in the 18 months I've owned it, needing a hard reset from holding the big button down.
>
> In frustration, I did a factory reset on the infotainment system software a few months ago. It seemed to get slightly faster for a couple weeks, and then back to the usual slow terribleness. I install the software updates when they pop up and it often just makes it worse and even more unstable and slow. I can use Apple CarPlay for maps and music, but that doesn't fix the backup camera nor other things only the car can do, and frankly for $60k I shouldn't have to rely on plugging in my phone to operate the car.
>
> I'm curious what others think about the infotainment system. Did I get a bad one or is this "normal?" Is this a hardware or software problem? I am genuinely regretting this purchase a bit. Should I bring it to the dealer and is there anything they can do?[17]

48. The consumer concerns listed above are only a sampling of the complaints reported by users to the NHTSA and elsewhere. Users recite their complaints on the NHTSA website and various online forums at length, yet none have reported successful resolution of these concerns.

## C. Volvo Falsely Represented the Vehicles as Safe, Reliable, and of High-Quality

49. At the heart of Volvo's marketing campaign is its consistent promotion that its Vehicles are designed for safety. For example, on its website, Volvo lists "safety" as one of the primary ownership benefits associated with its vehicles and states prominently: "We're dedicated to giving you the freedom to move in a

[17] https://www.reddit.com/r/volvoc40/comments/1cjz4dg/infotainment_system_is_terrible/ (last viewed November 04, 2025).

personal, sustainable, and safe way." Volvo further publicly advertises that "Safety. For Life. To help protect and care for everyone in and around your Volvo car."[18]

50. In describing its safety features, Volvo publicly represents that it goes beyond industry safety measures: "We don't just meet safety standards. We set our own. Long before third-party testing, our real-world research has led to life-saving innovations. Our knowledge from real life is the foundation of our safety standard, beyond what's required in regulations."[19]

51. Volvo further represents that its innovations regarding preventing crashes are designed to prevent injuries and fatalities: "Our vision is that no one should be seriously injured or killed in a new Volvo car. This vision has driven us to design life-saving innovations. Now, our ambition is a future with zero collisions. Because the safest accident is the one that never happens."[20]

52. Additionally, Volvo promotes the safety and quality of its vehicles and its technological features by headlining that "Everything we put in a Volvo car is designed to help create a safe space in and around our cars. Technology helps us do just that." These and other false representations induced Plaintiffs and the Class to buy and lease the Vehicles.

---

[18] https://www.volvocars.com/us/safety/safety-standard/ (last viewed November 04, 2025).

[19] https://www.volvocars.com/us/safety/overview/ (last viewed November 04, 2025).

[20] https://www.volvocars.com/us/safety/overview/ (last viewed November 04, 2025).

**D. Volvo Warrants That It Will Repair Vehicle Defects**

53. Volvo's express written warranty for the Defective Vehicles states "Your satisfaction with Volvo products and services is of prime importance. Volvo takes pride in producing quality vehicles, and our efforts are supported by a strong retailer network."

54. Volvo's express warranty period is "48 months or 50,000 miles, whichever occurs first" and coverage begins on "the date of first retail sale."

55. The Vehicles were defective as manufactured and sold and were in the same condition as they were when they left the exclusive control of Volvo and have not been repaired. Accordingly, Volvo breached its express warranty to the Plaintiffs and Class members.

56. The inherent defects in Volvo's Vehicles were unknown to Plaintiffs and Class members upon purchase or lease. Plaintiffs and Class members reasonably and in good faith relied upon Volvo's representations regarding the quality and safety of its Vehicles and component parts.

57. Volvo was and is under a continuing duty to disclose to Plaintiffs and Class members safety and quality issues relating to its Vehicles. Volvo knowingly and affirmatively misrepresented and/or failed to disclose the Defects associated with the Vehicles, as discussed above.

58. Plaintiffs and Class members reasonably relied upon Volvo's knowing and affirmative representations regarding its warranties, and the safety and quality of the Vehicles. Therefore, Volvo is estopped from relying on any warranty limitations in defense of this action. Any such limitation of the warranties, or the time frame within which to bring claims, is unconscionable and void because of Volvo's knowledge of the Defects.

**E. Factual Allegations Relating to Plaintiffs**

***a. Plaintiff Donald Fred Thomson***

59. On January 31, 2025, Mr. Thomson leased (and Mrs. Thomson also signed as a lessee) a 2024 Volvo C40 Recharge, VIN YV4ER3GL5R2106214, from Premier Volvo Cars in Overland Park, Kansas. He chose to lease the Volvo based on his prior experience and Volvo's warranty, advertisements, testimonials, and marketing materials touting Volvo's manufacturing quality, as well as its purported commitment to safety and driving performance. Plaintiffs test drove the Vehicle before leasing it, during which the Defects did not reveal themselves, and Plaintiffs were not informed of the Defects.

60. Mr. Thomson would not have leased his C40 Recharge vehicle if he had known that Volvo had concealed material safety Defects that led his car to spontaneously malfunction, and that its representations concerning the manufacturing quality and safety of the Vehicles were untrue.

61. On two separate occasions in or around February 2025, while backing up his Vehicle, Mr. Thomson experienced spontaneous RAB activation, despite the fact that there were no potential hazards in the near vicinity of the Vehicle.

62. On August 29, 2025, Mr. Thomson again experienced this sudden and violent RAB activation, even though there were no objects behind his car.

63. On September 2, 2025, Mr. Thomson again experienced the faulty RAB activation. The spontaneous and violent braking threw him forward, and Mr. Thomson, who had recently undergone cardiothoracic surgery, suffered significant pain in his chest immediately as a result.

64. Since February 2025, Mr. Thomson has also experienced numerous spontaneous blackouts of his vehicle's IP. These malfunctions pose serious safety concerns.

65. In or about February or March, 2025, Mr. Thomson contacted Volvo and took his Vehicle to the dealer to request immediate repair of his Vehicle but was informed by Volvo employees that they were unable to repair his Vehicle. He was told that Volvo was aware of the nature of the Defects and that the DD Defect was a common issue.

66. When Mr. Thomson explained the problems in the presence of the Volvo dealer's General Manager, Jimmy Loveland, Mr. Loveland was unsurprised about the issues.

67. Andrew Frazier, a Service Advisor for the Volvo dealer, told Mr. Thomson that these were problems [both the RAB Defect and DD Defect] that he deals with most every day. Mr. Frazier told Mr. Thomson to follow-up for the latest Volvo software updates with the dealer, which Mr. Thomson did to no avail.

68. Mr. Thomson also informed the dealer at a September 15, 2025 appointment about the problems with the car and the employee, Andrew “Andy” Sammis, recorded Mr. Thomson’s complaints on his handheld device.

69. Mr. Thomson is entitled to a Vehicle that operates and functions as warranted and represented.

70. Volvo did not offer to provide Mr. Thomson with a rental vehicle, reimburse him for out-of-pocket expenses, or compensate him for the loss of Vehicle value. Volvo also rejected Plaintiffs’ request that it take back the Vehicle or exchange it for a different Volvo model, instead telling Plaintiffs that to do so would cost Plaintiffs approximately triple their monthly payments or that they would have to pay off the entire lease in advance to obtain a different model.

71. Mr. Thomson suffered injuries due to the misconduct described herein. Mr. Thomson is leasing a Volvo C40 Recharge that has been significantly diminished in value and does not and cannot perform the basic driving functions without the risk of dangerous and unsafe malfunction.

***b. Plaintiff Cathy Jo Thomson***

72. On January 31, 2025, Mrs. Thomson leased (and Mr. Thomson also signed as a lessee) a 2024 Volvo C40 Recharge, VIN YV4ER3GL9R2101744. She chose to lease a Volvo based on Volvo's warranty, advertisements, testimonials, and marketing materials touting Volvo's manufacturing quality, as well as its purported commitment to safety and driving performance. She also test drove an identical make, model, and year Vehicle (VIN YV4ER3GL5R2106214) with her husband before signing the lease (as her to-be-leased C40 Vehicle was not in stock, but had to be delivered from another dealer), during which the Defects common to the make and model did not reveal themselves, and Plaintiffs were not informed of the Defects.

73. Mrs. Thomson would not have leased her C40 Recharge vehicle if she had known that Volvo had concealed material safety defects that led her car to spontaneously malfunction, and that its representations concerning the manufacturing quality and safety of the Vehicles were untrue.

74. Shortly after leasing her Vehicle, Mrs. Thomson began experiencing spontaneous RAB activation and IP shut-off on multiple occasions while operating her Vehicle.

75. On or about June 19, 2025, Mrs. Thomson contacted Volvo to request immediate repair of her Vehicle but was informed by Volvo employees that they were unable to repair her Vehicle. She was told that Volvo was aware of the nature

of the Brake Related Defect but had no remedy and she should "learn to live with it."

76. Mrs. Thomson reported that her Vehicle's RAB system engaged frequently and for no discernible reason, including when there was nothing blocking the back of the car. She explained that the sudden braking thrust her violently forward against her seatbelt and then backwards into the headrest.

77. Mrs. Thomson also reported that her entire IP display randomly turned off at least two times per week while she was driving. Upon the blackout, Mrs. Thomson lost access to her speedometer, blinker function, lane assist features, and the navigation map, putting her in serious danger while on the road. Upon taking the Vehicle to Premier Volvo Cars Overland Park, she was told that it was a Google software problem, but it was not fixed and has not been repaired.

78. Mrs. Thomson attempted to communicate with the Volvo customer relations department in July 2025, to no avail.

79. In June 2025, Mrs. Thomson lodged the following complaint with NHTSA, NHTSA ID Number: 11670052:

> There are 2 very serious safety issues that are extremely dangerous with this car. #1 - The Automatic Intervention Rear Brake Auto Brake engages for no reason when there is nothing behind the car. It happens when I am backing up very slowly. It throws me forward and then thrusts me back into the headrest. This has happened 3 times in 2 months. #2- At least two times a week the Information Panel turns off while driving for no reason and goes blank. I can't see the speedometer, blinkers don't work, lane assist doesn't work, and the map disappears. I have pull off the road and reset it to

> continue driving. We have taken the car to Premier Volvo dealership 2 times and have spoken to the Asst. Service Manager and the General Sales Manager. The Asst Service Mgr. explained these are well known safety issues. He explained #1 is a problem with no solution and #2 is a Google problem waiting for new software. The General Sales Manager agreed that #1 is an issue, but didn't offer a solution. He also said #2 is a Google software problem with this car, they are waiting for a software update. Also, the sales rep and Service Manager verified these issues are well known problems. These were not disclosed to us when we leased the car.

80. On or about July 29, 2025, an Assistant Service Manager, Nathan Christian, called Mrs. Thomson to ask her to fill out a detailed, 16-question questionnaire and to sign an agreement to allow Volvo to extract, process, and transfer personal data from her Vehicle. That agreement indicated the data would be used for, among other things, “managing a potential warranty case” and indicated that if she did not do so, Volvo Car Corporation would be “unable” to investigate her claim. The attempt of Defendants to obtain personal data to investigate after Plaintiffs’ direct communication and engagement with Defendants constitutes a compelling acknowledgment by Defendants that the reported issues are not within the Vehicle’s intended operation. Indeed, a Volvo dealer Assistant Sales Manager previously reported to Mrs. Thomson that the braking problem even happens in his wife’s Volvo vehicle and indicated they learned to live with it.

81. Mrs. Thomson is entitled to a Vehicle that operates and functions as warranted.

82. Volvo did not offer to provide Mrs. Thomson with a rental vehicle, reimburse her for out-of-pocket expenses, or compensate her for the loss of vehicle value. Volvo also rejected Plaintiffs' request that it take back the Vehicle or exchange it for a different Volvo model, instead telling Plaintiffs that to do so would approximately triple their monthly payments or that they would have to pay the entire lease in advance to obtain a different model.

83. Mrs. Thomson suffered injuries due to the misconduct described herein. Mrs. Thomson is leasing a Volvo C40 Recharge that has been significantly diminished in value and does not perform the basic driving functions without the risk of dangerous and unsafe malfunction.

84. Volvo has shown a deliberate disregard for the welfare and safety of the public by its concealment of the nature and extent of the Brake-Related and DD-Related Defects and its continued failure to make the appropriate repairs.

85. As a result of Volvo's misconduct, Plaintiffs and Class members have suffered actual and particularized injury, including ascertainable loss, because the Vehicles have at least one, and in some cases two dangerous safety Defects, which pose ongoing threats to occupants and have diminished the value of the affected Vehicles. All purchasers of the Defective Vehicles overpaid for their Vehicles.

86. Volvo has not repaired the Defective Vehicles, and owners and lessees are expected to either cease driving their cars or continue driving their cars with

dangerous Defects. Plaintiffs and Class members have not been offered compensation for rental car or other expenses related to the Defect.

87. By reason of the conduct described herein, and as a direct and proximate result of Volvo's concealment and nondisclosure of the safety Defects, Defendant caused concrete and particularized injury to Plaintiffs and each member of the Class.

## VI. NEW JERSEY'S SUBSTANTIVE LAW APPLIES TO THE PROPOSED CLASS

88. New Jersey's substantive laws apply to the proposed class, as defined herein.

89. New Jersey's substantive laws may be constitutionally applied to the claims of Plaintiffs and the class under the Due Process Clause, 14th Amend., § 1, and the Full Faith and Credit Clause, art. IV., § 1, of the U.S. Constitution. New Jersey has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all Class members, thereby creating state interests that ensure that the choice of New Jersey state law is not arbitrary or unfair.

90. Defendants' United States headquarters and principal place of business are in New Jersey. Defendants also own property and conduct substantial business in New Jersey and, therefore, New Jersey has an interest in regulating Defendants' conduct under its laws. Defendants' decision to reside in New Jersey and avail itself of New Jersey's laws renders the application of New Jersey law to the claims herein

constitutionally permissible.

91. A substantial number of members of the class also reside in New Jersey and bought or leased Vehicles in New Jersey.

92. Defendants' alleged misconduct emanated from New Jersey. VCNA developed and executed Volvo's advertising campaigns and brand communications in the United States and Canada, and VCUSA issued the New Vehicle Limited Warranty and controlled the administration of warranty claims in the United States from New Jersey. Defendants' New Jersey based conduct similarly injured and affected Plaintiffs and class members.

93. The application of New Jersey's laws to the class also is appropriate under New Jersey's choice-of-law rules because New Jersey has significant contacts to the claims of Plaintiffs and the Class, and New Jersey has a greater interest in applying its laws here than in any other interested state.

## VII. CLASS ACTION ALLEGATIONS

94. Plaintiffs reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

95. This action is brought, and may be properly maintained, as a class action under Rule 23 of the Federal Rules of Civil Procedure. All requisite elements of Fed. R. Civ. P. 23(a) and 23 (b)(3) are satisfied; there is a well-defined community of interests in the litigation; the proposed class and any subclasses are ascertainable;

and a single class action is the superior manner to proceed when compared to the joinder of hundreds of thousands of plaintiffs or tens of thousands of individual cases challenging the same practices.

**The National Class**

96. Plaintiffs bring this class action on behalf of themselves, and under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, as a class action on behalf of the following National Class:

> All persons or entities in the United States and its Territories who purchased or leased one or more of the Class Vehicles.

**The State Class**

97. In the alternative, Plaintiffs allege a statewide class action claim on behalf of a State Class defined as follows:

> All persons or entities in the State of Kansas who purchased or leased one or more of the Class Vehicles.

98. The National Class and the State Class, and their members are referred to herein as the "Class" or the "Classes."

99. The Class Period for the Class dates to back to the longest applicable statute of limitations for any claims asserted on behalf of that Class or subclass from the date this action was commenced, and continues through the present and to the date of judgment.

100. Excluded from the Class are Defendants, their current employees, co-conspirators, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; the undersigned counsel for Plaintiffs; and the Judge and Court staff to whom this case is assigned. Plaintiffs reserve the right to amend the definition of the Class or subclasses if discovery or further investigation reveals that they should be expanded or otherwise modified.

101. This action satisfies the predominance, commonality, typicality, numerosity, superiority, adequacy, and all other requirements of Rule 23 of the Federal Rules of Civil Procedure.

- Numerosity: The members of the Class are so numerous that joinder of all members is impracticable. The precise number of members is unknown at this time. The precise number of Class members can be ascertained by reviewing Defendant's records.

- Commonality and Predominance: Common questions of law and fact exist as to all members of the Class and subclass and predominate over any questions that affect only individual members of the Class. Plaintiffs' claims and the claims of the proposed Class members all derive from a common nucleus of operative facts. That is, irrespective of the individual circumstances of any proposed Class member, liability in this matter will rise and fall with core issues related to Defendants' conduct. Common legal and factual questions include, but are not limited to, the following:

  (1) Whether the Vehicles suffer from one or more Defects;

  (2) Whether the Vehicles have suffered a diminution of value as a result of those Vehicles' incorporation of the defective components;

(3) Whether Defendants knew or should have known about the Defects, and how long the Defendant knew of the Defects;

(4) Whether Defendants made misrepresentations, omissions, or concealed material facts about the Vehicles.

(5) Whether the defective nature of the Vehicles constitutes material facts reasonable consumers would have considered in deciding whether to purchase a Vehicle;

(6) Whether Defendants had a duty to disclose the defective nature of the Vehicles to Plaintiffs and Class members;

(7) Whether Defendants' conduct violated state consumer statutory provisions;

(8) Whether Defendants engaged in a practice or act that it knew or reasonably should have known to be an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact;

(9) Whether Defendants breached the express and implied warranties;

(10) Whether Plaintiffs and the Class were harmed and suffered damages, including suffering ascertainable loss, as a result of Defendants' conduct and, if so, the appropriate amount thereof; and

(11) Whether, as a result of Defendants' misconduct, Plaintiffs and the Class are entitled to equitable relief and, if so, the nature of such relief.

- Typicality: Plaintiffs' claims are typical of the claims of the members of the Class and subclass to which they belong. Plaintiffs and all Class members were subjected to Defendants' common business practices, described above, and assert common legal claims that are typical of those of the Class and each subclass. Plaintiffs and members of the Class have sustained damages arising out of Defendants' wrongful and

deceptive conduct as alleged herein. Resolution of the common issues presented in Plaintiffs' cases will resolve them in a common and typical manner for other members of the Class.

- Adequacy: Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent; they have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously in the best interests of the Class and subclasses. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

- Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class members is economically infeasible and procedurally impracticable. Furthermore, the expense and burden of individual litigation make it difficult or impossible for members of the Class to individually redress the wrongs done to them. Individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation presents the potential for inconsistent or contradictory judgments. There will be no difficulty in the management of this class action. A class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

102. A class should also be certified under Fed. R. Civ. P. 23(b)(2). Defendants have acted or refused to act on grounds generally applicable to the Class and subclasses, making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes.

## VIII. CLAIMS FOR RELIEF

**COUNT I**
**Violations of New Jersey Consumer Fraud Act ("CFA")**
**N.J.S.A. § 56:8-1, *et seq*.**
**(On Behalf of the National Class)**

103. Plaintiffs reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

104. The CFA was enacted and designed to protect consumers against unfair, deceptive and fraudulent business practices. N.J. Stat. Ann. §56:8-1, *et seq*.

105. N.J. Stat. Ann. §56:8-2 provides:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . .

106. Plaintiffs, other members of the Class, and Volvo are "persons" within the meaning of the CFA.

107. The Defective Vehicles manufactured and sold by Volvo are "merchandise" within the meaning of the CFA, and Plaintiffs and other members of the Class and Subclass are "consumers" within the meaning of the CFA and, thus, are entitled to the statutory remedies made available in the CFA.

108. Volvo, through its advertisements and public statements regarding the Vehicles' safety, manufacturing quality, and warranties noted above, used unconscionable commercial practices, deception, fraud, concealment, false promises, and misrepresentations, in violation of the CFA, in connection with the marketing and sale of the Vehicles.

109. Volvo also knowingly concealed, suppressed, and consciously omitted material facts to Plaintiffs and other Class members regarding the nature of the Defects.

110. These acts and omissions directly and proximately caused Plaintiffs and other members of the Class to suffer an ascertainable loss in the form of, *inter alia*, money spent leasing the Vehicles and other out-of-pocket expenses, together with appropriate penalties, including treble damages, attorneys' fees, and costs of suit. Had Plaintiffs been informed of the nature of the safety Defects, Plaintiffs would not have purchased and/or leased the Vehicles.

**COUNT II**
**Breach of Express Warranty**
**(On Behalf of the National Class and the State Class)**

111. Plaintiffs reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

112. Defendants are "merchants" as defined by the relevant statutes.

113. The Defective Vehicles are "goods" as defined by the relevant statutes.

114. As described herein, Volvo expressly warranted against defects in workmanship or materials. That promise served as the basis of the bargain between the parties and therefore constituted an express warranty.

115. Defendants intended that consumers would rely on those warranties when purchasing or leasing the Vehicles.

116. On the basis of the representations regarding the warranty, Plaintiffs and Class members agreed to purchase and/or lease the Vehicles. An express warranty therefore became part of the basis of the bargain.

117. Plaintiffs and the Class have performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the purchase or lease contract.

118. The Vehicles Plaintiffs and the Class received did not conform to Volvo's express warranty as alleged above, in that the Vehicles had one or more Defects that Volvo cannot and will not repair.

119. Had Defendants disclosed the Brake-Related and DD-Related Defects, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would not have been willing to pay as much for the Vehicles.

120. Volvo has failed to replace the non-conforming Vehicles with Vehicles conforming to Defendants' express warranty as to Plaintiffs and the Class, or to

compensate Plaintiffs and the Class in any way for the diminished value of the goods supplied.

121. Plaintiffs provided notice to Volvo of their concerns with the two safety-related Defects by visits to the dealer and by letter dated July 18, 2025, sent to Volvo Customer Relations Center, VCUSA in New Jersey, by certified mail, return receipt requested.

122. Plaintiffs also notified Volvo of its breach of its express warranty prior to the filing of this complaint by personally contacting Volvo and presenting their Vehicles for repair after experiencing the Defects and attempting to obtain immediate repair and replacement from Volvo.

123. As a direct and proximate result of Volvo's breach of express warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial. The precise amount of these damages is unknown at the present time but is in excess of the jurisdictional limits of the Court.

**COUNT III**
**Breach of Implied Warranty**
**(On Behalf of the National Class and the State Class)**

124. Plaintiffs reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

125. Defendants are "merchants" as defined by the relevant statutes.

126. The Vehicles sold and leased to Plaintiffs and members of the Class are "goods" as defined by relevant statutes.

127. Volvo, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that the Vehicles were of merchantable quality and, among other warranties, that the Vehicles would pass without objection in the trade or industry, and were and are fit for the ordinary purpose for which cars are used, such as driving without the risk of spontaneous braking and DS disruption.

128. The Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. In fact, the Vehicles cannot perform the ordinary purpose of being driven or parked without the risk of injury, and would not pass without objection in the automobile industry.

129. Volvo breached its implied warranties by selling, marketing, and manufacturing Vehicles that cause the risk of spontaneous braking or DD failure, as discussed herein.

130. The Vehicles were manufactured and/or designed defectively, and delivered to consumers as such. Therefore, they were defective immediately upon purchase or lease when they left the exclusive control of Defendants, and Defendants have breached the implied warranty of merchantability with respect to all Plaintiffs and Class members.

131. Had the Defects been disclosed to the public, Plaintiffs and Class would not have purchased or leased the Defective Vehicles, or would have paid less, because the vehicles do not comply with Defendants' representations and implied warranties.

132. Plaintiffs also notified Defendants of these serious Defects in a letter mailed via certified mail on July 18, 2025. Despite being notified, Defendant has not provided Plaintiffs and Class with a product that conforms to the qualities and characteristics that it warranted when it sold the Vehicles.

133. As a direct and proximate cause of the Defendants' breach of implied warranties, Plaintiffs and Class members have sustained damages, including economic loss equal to the purchase price of the Defective Vehicles, or the difference in value between the Vehicle as warranted and as actually sold, and out-of-pocket expenses related to the defect.

**COUNT IV**
**Violations of Kansas Consumer Protection Act ("KCPA")**
**Kan. Stat. Ann. §§ 50-623 *et seq*.**
**(<u>In the Alternative On Behalf of the Kansas State Class</u>)**

134. Plaintiffs reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

135. The KCPA prohibits deceptive and unconscionable acts and practices in connection with consumer transactions.

136. The KCPA is liberally construed to promote its policies of protecting consumers against suppliers that commit deceptive and unconscionable acts and/or practices. *Williamson v. Amrani*, 283 Kan. 227, 234 (2007).

137. Violations of the KCPA may occur before, during, or after the consumer transaction.

138. Plaintiffs Mr. Thomson and Mrs. Thomson are individuals, and are also husband and wife, who entered into consumer transactions, namely the aforementioned leases, to acquire property, namely, their Defective Vehicles, for ordinary personal, family, and household transportation purposes, and are therefore "consumers" under the KCPA as defined by K.S.A. § 50-624(b).

139. Defendants are both a "supplier" as defined by K.S.A. § 50-624(l).

140. Plaintiffs' leases of and Defendants' leasing of the Defective Vehicles constitute a "consumer transaction" as defined by K.S.A. § 50-624(c).

141. Plaintiffs have been damaged and are "aggrieved" pursuant to the KCPA as a result of Defendants' conduct and fraudulent and deceptive representations as alleged above.

142. In violation of K.S.A. § 550-626(a), Volvo engaged in deceptive acts or practices by concealing the material defects in Plaintiffs' Vehicles as described herein.

143. In violation of K.S.A. § 50-626(b)(2), Volvo made willful use, in oral and/or written representations, of an exaggeration, falsehood, innuendo, or ambiguity as to a material fact through its representations and advertisements regarding the Defective Vehicles and otherwise knowingly misrepresenting material facts regarding the existence and effect of the Defects in public statements and communications with its customers. Defendants advertised the Vehicles as being safe, reliable, high-quality, and free from defects, among other statements, despite knowing of the Defects. As described herein, Defendants nevertheless continued to sell and market the Vehicles using the same representations and warranties, which demonstrated an intent not to sell the Vehicles as advertised.

144. In violation of K.S.A. § 50-626(b)(3), Volvo willfully failed to state a material fact and willfully concealed, suppressed or omitted a material fact by failing to disclose that the Vehicles had dangerous safety defects in connection with the sale of its Vehicles.

145. In violation of K.S.A. § 50-626(b)(9), Volvo falsely stated, knowingly or with reason to know, that services, replacements or repairs are not needed by knowingly misrepresenting that the Vehicles were safe, reliable, and warranted against defects, among the other representations described herein. Instead, as alleged, the Vehicles harbored dangerous Defects that caused Vehicles to spontaneously brake or malfunction.

146. In violation of K.S.A. § 50-627(a), Defendants engaged in unconscionable acts or practices in connection with the sale of its Defective Vehicles by knowingly mispresenting that the Vehicles were safe to operate when they, in fact, were not.

147. In violation of K.S.A. § 50-627(b)(3), Plaintiffs and other purchasers of the Vehicles were unable to receive a material benefit from the subject of the transaction.

148. In violation of K.S.A. § 50-627(b)(6), Volvo made misleading statements of opinion on which the consumer was likely to rely to the consumer's detriment by misrepresenting that the Vehicles were of a certain standard, quality, and grade; namely, that they were designed and manufactured to be free from material defects and safe to drive.

149. Volvo's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their Vehicles.

150. Volvo knew or should have known that its conduct violated the KCPA. Volvo's concealment of the Defects in Plaintiffs' Vehicles was material to Plaintiffs' decision whether to purchase the Vehicles.

151. As a direct and proximate result of Volvo's violations of the KCPA, Defective Vehicle owners and lessees have suffered injury by being deprived of the

benefit of their bargain because the Vehicles they purchased or leased were worth less than they would have been if they were free from dangerous defects and loss of out-of-pocket expenses. Had Vehicle owners and lessees been aware of the Defects, they would have either not purchased or leased their Vehicles or would have paid less for them.

152. Under Kan. Stat. Ann. §§ 50-623 *et seq.*, Plaintiffs and the Class seek monetary damages for the harm caused by Volvo's violations of the KCPA as alleged herein.

**PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves, the Class, and Subclass, respectfully request that the Court:

a. Certify the Classes pursuant to Fed. R. Civ. P. 23 and appoint Plaintiff and their counsel to represent the Classes pursuant to Fed. R. Civ. P. 23(g);

b. Award Plaintiffs and the Classes, monetary damages as allowable by law;

c. Award Plaintiffs and the Classes, pre-judgment and post-judgment interest as allowable by law;

d. Award Plaintiffs and the Classes, reasonable attorneys' fees and costs as allowable by law;

e. Award Plaintiffs and the Classes, all appropriate equitable relief; and

f. Award Plaintiffs and the Classes all such further relief as allowable by law and equity.

**JURY TRIAL DEMANDED**

Plaintiffs, on behalf of themselves and the Classes, demand a trial by jury on all issues so triable.

Dated: November 04, 2025

MILLER SHAH LLP

/s/ *James C. Shah*
JAMES C. SHAH
NATALIE FINKELMAN
2 Hudson Place #303
Hoboken, NJ 07030
Tel: 866-540-5505
Fax: 866-300-7367
jcshah@millershah.com
nfinkelman@millershah.com

John F. Edgar (pro hac to be filed)
Alexander C. Melin (pro hac to be filed)
EDGAR LAW FIRM LLC
2600 Grand Blvd., Ste. 440
Kansas City, MO 64108
Telephone: (816) 531-0033
Facsimile: (816) 531-3322
Email: jfe@edgarlawfirm.com
acm@edgarlawfirm.com

*Attorneys for Plaintiffs*